Good morning, Your Honors. Yvonne Izu, Deputy Attorney General, on behalf of the appellants who, for convenience, I'll refer to as the State. The Federal District Court in this case struck down a State rule barring certain types of COI. It did so on two bases. One, the District Court found that the rule was in conflict with, and therefore preempted by, the Coast Guard enrollment and licensing statutes. Second, even though the State rule did not discriminate between in-State and out-of-State economic interests, the District Court found that it violated the Commerce Clause because the burden on interstate commerce, the District Court found, was excessive in relation to the local The State believes that the District Court was wrong on both grounds, and we ask this Court to reverse. First I'll address the preemption issue. In a nutshell, the State's position is that the Coast Guard license is not an unfettered license. The State clearly has authority to impose some regulations on these licensees, and these licensees must comply with these regulations. The extent to which the State may exercise that authority is determined by the test set forth in Douglas v. Seacoast Products, which was decided by the United States Supreme Court. And under that test, the State believes that the State rules should be upheld. Is there a difference between a State regulation of commerce and a State ban on commerce in terms of the analysis we look at, we use? In the sense that we're using the term ban here, it's merely a regulation. We are telling these commercial operators that Hanalei Bay cannot be used for your operations. That's pretty much a ban, isn't it? I mean, just to stay out. Yes. It's not saying stay out unless you cut the amount of noise, stay out unless you cut the amount of trips, stay out unless you do something else, which I think of as a regulation. I understand your assertion. It means to stay out. It says to stay out, and it says to stay out to certain, and not all commercial activities. You have two kayaks. You have two kayaks. Also, fishing vessels are exempt from that, from that ban. As long as they don't carry passengers. As long as the ban is for commercial vessels, and when the definition of commercial vessels are vessels that accept a fee for service or hire. A charter fisherman who goes out and takes six or seven plunkers with him. They would be commercial. They would be commercial and banned. That's correct. It's basically the person who owns his own fishing boat and goes out by himself to fish. Household fishing. That's correct. No sale. It could be commercial in the sense that when they catch the fish, they'll sell the fish. But they're not using the boat for hire. But if you start with a system, a regulatory system that allows 15 of these craft, and over time you get down to zero, don't you have to look at the zero as a ban, as opposed to a regulation? In that sense, yes. I don't disagree. If what you're saying is that we're banning a certain type of commercial activity in the bay, a certain type of vessel, yes, I won't disagree that that is a ban. I think when I first heard your question, is it a ban, my thinking was that is it like a total ban for everyone, everything. And that's not what we have here. And it's not a ban for these vessels all around the island of Kauai. It's just a ban from Hanalei Bay. Which they consider is critical. Which these boaters consider is critical. And which the state, in trying to balance the different interests and the problems that they face in Hanalei Bay, did not think it was critical. There are other places from which these boats can launch and can take passengers. Are there other things the state can do besides ban in order to protect the interests the state sees to be at stake? I think there are. But I think then we're getting into the court acting as a super legislature. I don't know about the pejorative of courts acting as legislature. But it occurs to me that one element of what you're trying to do here is the reasonableness of what the state is doing. And that's exactly what I think the crux of this case is. The Douglas test basically has four parts to it, four questions to it. The first is whether the regulation is non-discriminatory. The second is whether it relates to a conservation or environmental protection measure. Third is the regulation reasonable. And fourth is the regulation otherwise within the police powers of the state. And I think the crux here is whether the regulation is reasonable. And the district court merely looked at the impacts that these commercial boats have on the water. She says, well, you know, there's no evidence to show that having these boats on the water is going to overcrowd the water. She said that there's no evidence that having these boats in the water is going to degrade the water quality. What she failed to look at are the land side issues, which was the overcrowding of the beach park, the illegal parking, the traffic congestion, the lack of public facilities, restrooms. If you're looking at navigation, isn't that a legitimate point for the court to start from, at least, is what's going on on the water? What is navigation undergoing? Because it occurs to me that if the state has parking problems and parking lot problems and public access problems, that you can't address those on a navigation servitude or by navigation methods. You've got to have the state go in and look at the shore side and handle it separately. And that's what the state was attempting to do. You're just keeping these people off the shore under the guise of regulating commerce on the water. Now, is that a legitimate navigation regulation? What the state was attempting to do, what was happening was that these commercial boaters were launching, having their customers come down to the beach, using the beach area, the shore area, and launching from there and dropping them off back there. That was what was creating the problem. The state looked at it and they said, well, if we took these boats away from these areas, if we told them they couldn't use this area, they would launch from elsewhere. We would disperse the crowding here. We would get rid of the problems with parking, with the lack of facilities. We would disperse them to other parts of the country. Again, it doesn't have anything to do with crowding on the water or water quality or the flora and fauna of the water to worry about the land-based facilities. In other words, I'm just wondering, at what point do land-based concerns justify regulation of navigation? I think in that Portland-Huron cement case, the regulation that was at issue there was an air pollution regulation. It was concerned about air pollution, smoke abatement.  But the court upheld, in that case, banning certain types of boats from the Port of Detroit because they didn't meet the smoke abatement statutes. It wasn't a water quality issue. It was an air pollution issue. Caused by the boats. Caused by the boats, yes. Again, I think we go back to the Douglass, the four-part Douglass test, and ask ourselves whether this state rule meets the four parts of the Douglass test. And the state contends that it does. It is non-discriminatory. Now, the district court seemed to indicate that it was discriminatory because it was discriminating between out-of-state and in-state residents. Well, it doesn't. The court was wrong in that. Whether the tourist was from Hoboken or Hanalei, the ban, if you would, affected them equally. But as a practical matter, the great bulk of the people that show up at that point are not from Hawaii. As a matter of fact, the voters in this case presented evidence, which was not disputed by the state, that about 70% of their customers are from out-of-state. They're not from the state of Hawaii. But that's not discrimination. Well, it may not be discrimination, but it might be seen as a burden on commerce. If tourists are in interstate commerce, then there is a federal question, isn't there? And that goes to the second issue, which is whether the court, again, in effect, struck down the rule on two bases. One was the violation of the interstate clubs. Well, and also on the preemption, if you have a Coast Guard license to navigate, the state doesn't have any right to come in and say you can't navigate here if it's navigable waters of the United States. And the Douglas Seacrest Products case makes it absolutely clear that the state does have some authority to regulate. That's true. Some. Some authority. And then how do you keep out? You just put up a poster, no trespassing, and keep out all over the beach, then that's another thing, isn't it? Well, I think that if it just says keep out, you can't go here, and there's no rational, if there's no reason for it. Well, there's a rational reason. The local people are tired of the traffic and the fact that they can't get across the street on a Saturday afternoon or whatever because of the line of cars and some noise and just extra busyness of all these tourists coming into this little place. They don't want to be bothered by it. But that's a legitimate issue. But the question is, can it preempt the federal interest in expediting commerce and navigation and so on, areas that the federal government has involved itself in? And, again, I think that goes back to the question of, is this rule reasonable in relation to the problems that the state was trying to address? And I think to make that determination as to whether it was reasonable,  you look at what the alternatives were for these boaters. There were other places that they could launch from. Well, on the same side of the island? Yes, yes. As a matter of fact. There are a lot of little indentations in the shore all over the island, but there are not a lot of places like Hanalei Bay. Historically, what had happened was that prior to this ban saying none of these boats can operate in Hanalei Bay, the rule was that there could be 15 permits. Well, that sounds like real regulation, whereas this new law sounds like a total ban. Then the state has a problem with where, because what the district court held was that if these boats have these licenses, then we cannot tell them you can keep out. Now, if we said 15 and the 16th one comes in and says, well, that's a ban on me because you're telling me I have to keep out of here. Well, the Forest Service does this in certain national forests. They say you can bring in to a roadless area, you can bring in ten units. A unit can be either a person or a horse. You put five people on five horses, you've got ten units. The sixth one comes in with a horse, the ranger says go back, apply for another day. That's regulation. They apparently can do that. And then it gets back to, well, how do we set that limit? What if we set it at two? Would that be still regulation or would that be a ban? There might be a reasonableness question. Exactly, and we go back to the reasonableness question. And if it's reasonable to say zero, then it should be upheld. Do you have a case, you mentioned the Detroit case. Do you have a case that has upheld the use of navigation controls to address a shoreside problem? Offhand, I don't, but what I would do is refer the Court to the Coastal Zone Management Act, in which the federal government encourages the states to regulate both on the water and on the land to preserve, you know, shoreside and nearshore water values. Is that the authority the state asserts here for what it did? No, the cases are clear that the state does have concurrent authority with the federal government to regulate unnavigable waters. This Court in Beverage and Barber v. Hawaii made that clear. I think the Grand Canyon Dories case also made that clear. The United States Supreme Court in the Ray case looked at, on the one hand, the state's regulation of national and international maritime commerce and said that the federal government was so embedded in that area and so historically been an exclusive realm, but on the side where the Coast Guard would regulate within the territorial waters as far as, you know, being able to establish safety zones to limit access at certain times, et cetera, the Supreme Court in that Ray case said that the states have concurrent jurisdiction with the federal government and can regulate in those areas. And we suggest that that's what we're doing here. What exactly does the permit authorize the permittee to do? You mean when they have the permit? Yeah, when they have the permit. What does the permit entail? The permit authorized these vessels to conduct commercial activities within the Hanalei Bay area. It did have a limit as to, I believe, they had to, there were a number of conditions that they had to abide with, stay within the egress zones. It did have, I believe it did have a limit on the number of passengers that they could take. The number of trips per day. The number of trips per day. Does the permit have anything to do with where they can board or disembark passengers? Because of the fact of the ingress-egress zone, yes. I mean, they were only certain. I mean, is that a practical matter or is it a part of the permit? I believe that was just a practical matter. I don't believe it's specified in the permit where they would launch and debark. Okay, so what you do basically is to try to cut off navigation across the bay in order to get rid of the people at the dock. I understand, yes. Is there another way to do that? Probably, and probably is to either change the ingress-egress zone or just put the dock off limits to these boaters. My question to opposing counsel is what difference that would make to the analysis when you're through. Okay. If you want to reserve some. I'd really like to reserve some. Two seconds. Some time. Some time. I would just very, very briefly. You really are out of time. Oh. So if you want to reserve anything at all, then perhaps you might want to stop. Okay, I'll reserve some time. Okay. Thank you. Please, the Court. Dennis Niles and Jack Schweigert on behalf of the plaintiffs' appellees, two of whom are present in court this morning. Are they the ones that are nodding in the back? I see nodding off or nodding in agreement. Nodding in agreement. Buddy English. I think the difficulty we have is the state has chosen an inappropriate means to achieve what they are touting as being. Would the state say, you know, docks off. No more dock. No more egress. No more boarding. No more disembarkation. I think not, as a matter of fact. I think that that would be problematic, and I think there is a case that I saw. It's a very old case that had to do with a dock, and there was a public roadway that led to the dock that led to the navigable waterway. And I think that the case may have involved some kind of fee or impost that was levied as a condition to crossing that in order to reach the navigable waters, but I think that that had the same implication because you can't choke off, you know, this artery of commerce at that particular point. So the facts in this case are clear. By administrative regulation, the state has identified specific ingress-egress zones. This went through the public hearing process. They located, and you'll find in the appendix, a map of Hanalei Bay showing where these ingress-egress zones are, and obviously the one intent of the zones was to separate classes of users. There are specifically delineated swimming areas, for example, because the state, in its wisdom, recognized that perhaps we ought to draw some lines on the bay towards the end of separating users to avoid the very conflicts that they're now concerned about. But that went through the rulemaking process, and that's the law. So we don't now have before us a question, would it be possible for them to constrict this one, you know, these ingress zones to achieve the same end? I think they would have a problem doing that, but that's not an issue before us. I mean, we can think of a number of different permutations that make the case harder. I don't think we can conceive of a single permutation that would make the case easier for us to challenge this ban because of the inappropriateness of the means. Counsel makes two points that I want to address, and fundamentally she continually urges both here and in the district court that the court should apply the most passive standard of review available to the court. It really, if you read what was argued below and if you read the argument here, she's basically saying you must defer to the judgment and treat this as if it were a garden variety police power case. And of course it is not. So that's one of the fun, and there's a reason she must stake out that position, and that is she offered not a scintilla, not a wit of evidence below, to rebut our showing that the existing regulatory scheme, a pervasive scheme as you have noted, was ineffective to achieve the goals of preserving the marine environment and protecting the safety of other users of this navigable waterway. It was their burden under a number of different theories to come forward and at the very least demonstrate why this existing regulatory scheme, which is pervasive by any standard. Judge Goodwin offers us the question about conflicts during Saturdays when local people might be using the area. That's already been addressed. They can't operate on Saturdays. So it does not go too far to characterize this scheme as pervasive. So the question becomes, what then is the burden on the state to take the grave step of banning this type of activity? And is it rational, and this is a problem the district court had, and the district court could never get an answer from counsel, is it rational just to focus on passenger carrying vessels when you have other vessels that are having equal impacts on the waterway? Why is it rational to focus on the type of license they have or the type of activity in which they're engaged? And there was no explanation for that in the trial court, and there certainly has been no explanation in this court. Instead, they even hearkened to the political question doctrine, suggesting that this is a political judgment and this court should not even review and that they don't have the obligation to come forward with any showing. And, of course, all of the cases are the contrary. Now, counsel says, well, how do we draw the line? We don't know what the standard is. Well, Ray v. Arco, which they themselves cite, provides a standard. If there is something about the peculiarities of a given waterway that warrant regulation, then you may adopt a regulation that addresses that peculiarity, and all boats, and we acknowledge we're subject to that regulation, as long as it's reasonable as a general matter. They did not do that here. They did not say, we have determined that the carrying capacity of this waterway is X, and therefore it is necessary to put a limit on the number of vessels that navigate this waterway on any given Sunday. They didn't do that. They instead postulated that there is a problem with user conflicts, and they said, we're going to solve that problem by going after the folks that have federal licenses to carry passengers for hire. In doing that, right out of the box, they create a problem of actual conflict. Federal law, the licenses that my clients hold, allow what the state is now prohibiting. So this is one of the few instances where we're going to have a situation of direct conflict, and frankly, we don't need to go further than that. Once you see that conflict, because of the course means that were chosen by the state, the inquiry is at an end. We talk a little bit about the intermediate burden of proof. You don't need to get there if you find actual conflict. But it's clear, once the state exercises its authority under United States v. Locke and Ray v. Arco, and even going back to the Huron case, which we think is dispositive, frankly, because Huron says, you can regulate even-handedly, and of course there, the air pollution abatement ordinance applied across the board to all activity. It did not center on a particular vessel. It wasn't targeted to vessels at all, in fact. Here we have a regulation that not only targets vessels, but bans those vessels from the waterway. And in Huron, the Supreme Court said, that is improper, out of the box. And the Douglas Court said the same thing. You cannot deny access. You can regulate the dickens out of them, as long as you can tie it to the peculiarities of navigation, but you can't deny them to access. You can't deny them access. That takes me to the other point that just came up at the conclusion of my colleague's remarks, and that has to do with the shoreside impacts. We went to great lengths to point out how our permits were conditioned on satisfying the requirements under county of Kauai law with respect to special management areas. And the state law, Chapter 205A of the Hawaii revised statutes, delegates to the individual counties responsibility for administering the special management areas, including the very shoreline that we're talking about. So the county has authority under the SMA process to identify impacts. Certainly traffic is an environmental impact that has to be addressed by someone proposing a particular activity. We were required to go through and get permits. We had to file environmental impact statements, as a matter of fact, to satisfy the county that we could conduct our activity in a way that would not have an untoward impact on the shoreside or even the marine environment, for that matter. And we did that. So the shoreside concerns rest with the county, and the record is clear. We satisfied those requirements, and we went through the permitting process, and we got the permits. So it takes us back to really where we began, and that is what is the scope of the authority of the state to regulate navigation on a navigable waterway? And again, the answer is clear from our co-regulation. So long as it's based on the peculiarities of local waters, the call for special precautionary measures will be allowed. Had they determined that the capacity of the river mouth at Hanalei would support only 20 vessels, well, then we could take the next step. Well, how do we allocate those 20 vessels? Is it first come, first serve? How do we go about it? It almost reminded me of this court's recent decision with respect to the regulation of elk hunting in Arizona along the Colorado River, where they had a permitting system, and there was a lottery for various non-resident permits. But you would have a regulatory scheme that is even-handed, a scheme that singles out one type of vessel because of the activity that occurs aboard that vessel for banishment and allows a similarly situated vessel with the same engines, the same impact on the waterway, is not by any definition even-handed. So we would argue that even aside from the actual conflict that we have here, this is a paradigm case where the state has overstepped its authority and has adopted a rule that is not within its power to adopt. How do you respond to the argument that your opponent makes? As I understand it, it's something like this, that the state imposed a limit on the number of vessels, what, 15 or whatever it was, and over time went down to three and now to zero. And they're saying, as I understand the argument, that this is just the next step in that historic regulation that they had already engaged in, and it's not a big deal. Well, factually, let me just correct the factual record. In 1988, an ad hoc committee, of which Ralph Young was a member, working with this very department, or actually its predecessor, the Department of Transportation, canvassed the island, canvassed island users, and developed a rule, following a process that led to a rule, that established the 15-permit standard. Not all 15 of those permits was issued. In fact, a significantly smaller number was issued. One reason for that was only a few of the operators were willing to go through the county's environmental assessment, environmental impact statement process, and acquire the special management area permit that the county required in order to have activity on the shoreline. So only a handful of operators went through that, and these folks are now before you. And there were two others who chose not to participate in this case, but I think the maximum number was five who actually went through the process and got these permits. And that resulted in a status quo. In other words, the state determined at some point that 15 would work. The number never got above five, and so one could presume that if 15 were okay, five would certainly be facially okay. And then we argued that if they want to take the step of eliminating those five and adopting a ban, that they have to have some justification for doing that. And that really is the nub of this case. There is nothing in the record that approaches the kind of showing that the Supreme Court has contemplated in saying that when you hold a federal license, that license does not immunize you from even-handed local regulation designed to address the peculiarities of local navigation. If anything can be said about this case, it is this ban is not related to navigation, has nothing to do with it. Instead, as I argue in our answering brief, it represents a social judgment about the value of a form of commerce on a navigable waterway. You might want to give your co-counsel a shot. Is he twitching also? Is he going to do the whole thing? Okay. Sorry. I just assumed that you might be wanting to say something. And in case I do have anything that I've left out, but I think it really just stands on its head, this federal scheme that we have. And we have acknowledged from day one that there is a scheme of concurrent jurisdiction. We have never denied the ability or the power of the state to regulate. This case arises because that power was misused, and it was misused in a way that has serious implications in terms of the Constitution and devastating implications for these individual commercial boat operators who have chosen to conduct their livelihood, their businesses, from Hanalei. Lastly, just as a geographic matter, if you look at the map, there is no way to access the Nepali coast other than through the two harbors on the southwest side of the island and Hanalei. So there's nothing proximate. Indeed, one of the purposes of the Ad Hoc Advisory Committee was to prevent people from operating off the beach. There was a time when people were operating without permits from every nook and cranny that would allow somebody to launch an inflatable boat. The idea was to get those vessels off the beaches and into areas of traditional boating activity. As we point out, Hanalei has been a site of boating activity, commercial and recreational, for as long as Hawaii has been a state. So with that, I will... Okay. Thank you. Thank you. Thank you. I think what it comes down to, and I don't think we have a disagreement here, is whether the state can regulate navigation to address landslide issues. Now, what Mr. Niles has pointed out, a lot of the things that he says that the state doesn't have a scintilla of evidence on this or that, as with the district court, they are focusing solely on the water issues. Is water quality affected? Is safety in the water affected? Is overcrowding in the water affected? They didn't look at the landslide issues. The state does not dispute that that is not what the state was trying to address. We were trying to address landslide issues. And the question becomes, can we address landslide issues through regulation of navigation? Now, one of the things that I wanted to respond to, Mr. Niles, was when the first question was asked to him whether the state could say no launching from the land. And he said that we would have a very difficult time because, you know, they have regulations saying, okay, for water safety, you know, you have this certain ingress, egress zone. We went through the public hearings and whatnot. Well, the thing is that, again, he's looking solely at the water issues. The ingress, egress zones address swimmers on this side, motorized boats here, other types of boats there. It's looking solely at the water. It didn't address the landslide issues, the crowding of the beaches, the parking problems, the traffic problems. It didn't do that. And that's what the state was trying to address in saying none of these boats can be here. And we would ask this court to find that that was a reasonable way to address these problems and uphold that rule. Thank you very much. All right. Counsel, thank you for your argument. In this case, the matter just argued will be submitted and the court will stand adjourned. Thank you.
judges: Goodwin, Rymer, T.G. Nelson